# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **Patriot Response Group, LLC** | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | Civil Action No. |
| **v** | ) | |
| | ) | |
| **Aptim Environmental & Infrastructure, LLC,** | ) | |
| | ) | |
| **Domingo Camarano,** | ) | |
| | ) | |
| **Jonathon Hunt, and** | ) | |
| | ) | |
| **Lissa Metoyer** | ) | |
| | ) | |
| *Defendants* | ) | |

## COMPLAINT FOR DAMAGES

NOW INTO COURT come Petitioners Patriot Response Group, LLC ("Patriot") and, which hereby file this Petition against Aptim Environmental & Infrastructure, LLC f/k/a Aptim Environmental & Infrastructure, Inc. ("Aptim") Domingo Camarano , Jonathon Hunt and Lissa Metoyer (collectively with Aptim, "Defendants"), and in support thereof aver as follows:

## PARTIES

1.     Patriot is a Delaware Limited Liability Company organized under the laws of Delaware, located at 2770 Indian River Blvd., Suite 501, Vero Beach, FL 32960.

2.     All members of Patriot Response Group, LLC are Florida domiciliaries and residents.

3.    Aptim is a Louisiana limited liability company domiciled at 4171 Essen Lane, Baton Rouge, LA 70809.

4.    Defendant Aptim is the successor by merger to Aptim Environmental & Infrastructure, Inc., which was a Louisiana corporation domiciled at 4171 Essen Lane, Baton Rouge, LA 70809.

5.    Defendant Jonathon Hunt is a natural person of the age of majority who is domiciled in East Baton Rouge Parish, Louisiana. At all relevant times, Defendant Jonathon Hunt communicated with and as described herein acted adversely to, Petitioner from Aptim's office in Baton Rouge, Louisiana.

6.    Defendant Domingo Camarano is a natural person of the age of majority who is domiciled in California. At all relevant times, Defendant Domingo Camarano communicated with and as described herein acted adversely to, Petitioner from Aptim's office in Baton Rouge, Louisiana.

7.    Defendant Lissa Metoyer is a natural person of the age of majority who is domiciled in California. At all relevant times, Defendant Lissa communicated with, and as described herein acted adversely to, Petitioner from Aptim's office in Baton Rouge, Louisiana.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction and venue over this dispute is proper in the United States District Court for Middle District of Louisiana under, *inter alia*, United States Code Sections 1331 (Federal Question Jurisdiction) and 1332. (Diversity Jurisdiction)

9.    Upon information and belief, at the time of entering into the contract in question between Aptim and Patriot, Aptim was a corporation domiciled in Louisiana.

10.    Because Aptim was a Louisiana domiciliary at the time it entered into the contract, this court has jurisdiction pursuant to 28 USC § 1332 (Diversity Jurisdiction).

-2-

11.    Because all of the members of Aptim are believed to be non-Florida domiciliaries, this court has jurisdiction pursuant to 28 USC § 1332 (Diversity Jurisdiction).

12.    The dispute in this case revolves around a contracts dispute of a federal contract (FEMA and HUD) which flows down into a subcontract a multitude of regulations contained in the Federal Acquisition Regulation.

13.    Because this case will be called to examine regulations in the Federal Acquisition Regulation, it contains a federal question – 28 USC 1331.

14.    The Subcontract at issue in this case was executed by Aptim in Louisiana.

15.    Much of the misleading communications and fraudulent conduct set forth herein were initiated in and communicated from Aptim's Baton Rouge office.

16.    This case involves the administration of a Federal Emergency Management Contract and thus, involves the Federal Acquisition Regulation and payment of subcontractors regulated thereunder – a Federal Question.

### GENERAL FACTS

17.    In the fall of 2017, the U.S. Virgin Islands ("USVI") experienced two back-to-back Category 5 hurricanes, Hurricanes Irma and Maria.

18.    The two hurricanes resulted in an estimated $11 billion in damage, with more than 18,000 homes and businesses having suffered damage or been entirely destroyed.

19.    In the wake of the hurricanes, the Federal Emergency Management Agency ("FEMA") authorized a roof-rebuilding program and an expanded version of its Sheltering and Temporary Essential Power ("STEP") program that would fund repairs of houses to avoid the need for residents to relocate to hotels and other temporary housing solutions.

-3-

20.     FEMA provided the funds for the roofing and STEP programs to the Virgin Islands Housing Finance Authority ("VIHFA") for administration.

21.     In turn, the VIHFA contracted with two engineering firms, AECOM and Defendant Aptim, to handle construction under, among other sources of financing, the roofing and STEP programs.

22.     Aptim hired Patriot to perform the work of rebuilding roofs on St. Croix in the Virgin Islands.

23.     Aptim hired Patriot to perform STEP work on St. Croix in the Virgin Islands.

24.     The negotiation of specific terms and conditions of the contract between APTIM and Patriot was between Defendant Domingo Camarano and James Foster.

25.     As part of the incentive for entering into the agreement, James Foster was assured by Defendant Camarano, that Patriot would be reimbursed for labor, specifically.

26.     As recently as late March 2019, Plaintiff avers that AECOM and Aptim had received their respective portions of nearly all of the $187 million in federal funds allocated for the recovery programs and that another $86 million in funding was expected to be received soon.

27.     Patriot has sufficient cause to believe Aptim has been paid for the work on St. Croix as disclosed by Aptim to Patriot.

28.     Despite having reportedly received nearly all the available funding, Aptim has failed to pay Petitioners for roofing work performed for Aptim on the Virgin Islands as part of the roofing and STEP programs.

29.     Despite having reportedly received nearly all the available funding, Aptim has failed to pay Petitioners for the STEP program work performed for Aptim on the Virgin Islands as part of the roofing and STEP programs.

-4-

30.     Despite having reportedly received nearly all the available funding, Aptim has failed to reimburse Petitioners for its labor costs detailed in Attachment "F" of their subcontract with Plaintiff.

31.     The contract between Aptim and Patriot requires payment in Net 15 days from invoice.

32.     The contract between Aptim and Patriot contains no "pay when paid" clause for 80% of the payments owed.

33.     The contract between Aptim and Patriot allows for payment when paid for up to 20% of the invoices only.

34.     Aptim, Jonathon Hunt, the Subcontract Administrator and Domingo Camarano, the Vice President, misled Patriot into being prepared to begin work no later than September 28, 2018 in the Virgin Islands and completing the roofing work while intending to force an oppressive, retroactive pricing structure on Patriot after all the roofing work was completed.

35.     Aptim, Jonathon Hunt and Domingo Camarano misled Patriot into remaining in the Virgin Islands and completing the STEP program work while intending to force an oppressive, retroactive pricing structure on Patriot after all the STEP program work was completed.

36.     Lissa Montoyer, presumably Defendant Domingo Camarano's girlfriend (or were at a minimum in a meretricious relationship) during the course of this dispute, acting under Defendant's instructions and being fully aware of the other Defendant's intentions, was complicit in directing the work of Plaintiff during the performance period of the contract.

37.     This case primarily concerns Aptim,  Jonathon Hunt and Domingo Camarano's decision, supported by the complicity of Lissa Montoyer, to deceive Petitioners into performing roofing work, as well as STEP work under the expectation that Petitioners would be paid on a fixed-price

basis, as well as a separate agreement to provide its labor hour charges on a manhour cost reimbursable rate basis, despite knowing that they would ultimately disregard Aptim's agreement ("Subcontract"), cram down the pricing for the completed work and withhold payment from Patriot to force Patriot into agreeing to a new, substantially reduced payment to Petitioners.

## Defendants' Violations of the Louisiana Unfair Trade Practices Act and Fraudulent Misrepresentations

### General Facts

38.    Beginning in mid-September 2018, Aptim engaged in negotiations with Patriot to consummate a subcontract agreement pursuant to which Patriot would perform certain roof repairs and rebuilds, as well as STEP work for Aptim as part of the hurricane-recovery efforts in the U.S. Virgin Islands.

39.    These negotiations were led by Defendant Domingo Camarano.

40.    The terms of the negotiations were then provided to Defendant Jonathan Hunt.

41.    Jonathan Hunt then drafted and executed the Subcontract dated September 26, 2018, discussed further below.

42.    The Subcontract incorporated the pricing proposal requested by Aptim and provided by Patriot to Aptim.

### Construction Portion Facts

43.    The pricing proposal provided by Patriot and incorporated into the Subcontract included a fixed, per-square-foot price for rebuilding roofs.

44.    The fixed, per-square-foot price for rebuilding roofs was a heavily negotiated term of the subcontract.

45.    Throughout the negotiation process, Aptim requested and Patriot provided, only pricing proposals that included a fixed price for the actual roofing repair.

46.    Payment was not made pursuant to the Subcontract terms.

47.    Aptim, at no point during the negotiations leading to the execution of the Subcontract, mentioned pricing premised on whether a roof required a 50% rebuild, 75% rebuild, or 100% (complete) rebuild (hereinafter, the "50-75-100 pricing structure") nor does the resulting Subcontract include a criteria of the 50-75-100 pricing structure.

48.    Although the parties agreed to a fixed, per-square-foot price for rebuilding roofs, upon information and belief, either before or after executing the Subcontract, Aptim developed the intent to cram the 50-75-100 pricing structure down Patriot's throat and to ultimately withhold payment owed to Patriot as leverage to force Patriot into accepting the new, substantially reduced pricing.

49.    The contract contained a rate sheet provided as B and C, for STEP and Roof prices to the originally signed contract.

50.    Without mentioning any concerns or disagreements over pricing, Defendant Jonathon Hunt said nothing about the Notice to Proceed included in the contract which mandated a complete mobilization of Patriot's workforce no later than September 28, 2018.

51.    In response to the Notice to Proceed and executed terms of the contract, Patriot had its workforce, consisting of a total of approximately 150 managers and workers, standing by, experiencing general conditions and labor costs, waiting for work orders to be issued.

52.    Having relied on the Notice to Proceed, Patriot held its workers in place, in compliance with its Subcontract while Aptim failed to issue any work orders to Patriot for nearly one month while Patriot's workers sat idle.

53.    Patriot's first work orders began on October 26, 2018, but only consisted of a de minimis six repairs. Patriot's workforce was not fully employed or utilized until on or about November 19, 2018.

54.    Upon information and belief, Aptim intentionally delayed providing accurate and definitive estimating criteria to Patriot, thus allowing Aptim to delay issuing work orders to Patriot, because Aptim was making a substantial profit on costs it was passing through to the government.

55.    Despite having an exhibit in the contract which explained how Plaintiff would be paid, Aptim began manipulating the method in which was to provide estimates.

56.    Aptim had an understanding from its negotiations with Defendant Domingo Camarano, as to how it was to calculate estimates and bill for various line items.

57.    Aptim and Patriot had a meeting of the minds as to how the contract was to be billed per the various payment schedules and exhibits.

58.    Delaying completion of Patriot's work would lead to a contract extension and greater profits to APTIM as a result.

59.    Aptim's intent in maximizing pass-through costs and its own profits is evidenced by Aptim's decision to over-staff projects, in some instances assigning five, ten, or more inspectors per home.

60.    Aptim had a strong financial incentive to delay issuing work orders so it could continue to profit from the pass-through costs associated with this over-staffing.

61.    As a result of Aptim's delay in issuing work orders, Patriot experienced a six-week delay during which Patriot paid substantial amounts of money to house and otherwise support workers who had little to no work to do.

62.    On October 27, 2018, Michael Spitz (Deputy Construction Manager) from Aptim sent an email to, among others, Patriot with the subject line "Estimating for 50-75% Rebuilds." The email stated that "[f]or estimating purposes we do have approval to use the roof Rebuild pay items in the 50-75% Rebuild estimates as previously discussed. The quantity to be used with this pay item is supposed to be the expected area of roof to be Rebuilt and is generally expected to be less than 100% of the total square footage."

63.    Allco's representative Joe Ping, Estimator, responded to seek clarification of "what controls percentages over 75%, but under 100%." Mr. Ping further stated his "understanding that 50, 75 and 100 was based on system and not square footage. Roof, purlin, and deck was 50. Add structure and it is 75. Add bond beam and it is 100." Later that day, Michael Spitz responded that Aptim "went down that route with our client and they wouldn't agree. The percent is the area of roof. The depth of reconstruction is loosely defined in the scope that is included with each permitted drawing set."

64.    Patriot chose to ignore the direction from Aptim as the Subcontract required it to comply only with subcontract changes issued by the contract's administrator at Aptim and which followed the subcontract change order process stated in the Subcontract.

65.    Aptim remained silent concerning the 50-75-100 pricing structure and its intent to insist on the 50-75-100 pricing structure after Patriot's work was completed.

66.    On information and belief, Aptim had already agreed to this revised pricing structure (50-75-100) with USVI.

67.    Aptim and Patriot engaged in discussions throughout November and December 2018, during which the parties discussed an extension of the Subcontract through January 2019.

-9-

68.     Aptim never, at any point during October, November, and December 2018, mentioned any concerns, changes, or proposals concerning the pricing structure as Patriot believed it to be.

69.     Aptim already knew of, and was intending to enforce, a cram-down of the pricing for roof rebuilding after Patriot completed its work.

70.     Aptim withheld from Patriot the information concerning Aptim's intent to disregard the payment, insist on a cram-down of pricing, and leverage its wrongful intent against Patriot by withholding payment.

71.     Aptim withheld this information to meet its obligations to have persons performing hurricane-recovery work on the Virgin Islands and to ensure that Patriot would remain on the job, would not order its workforce to leave the Virgin Islands and would complete the roofing projects.

72.     On November 7, 2018 Patriot submitted its first construction invoice to Aptim.

### Labor Invoicing Facts

73.     On October 29, 2018, Patriot submitted its first labor invoice to Aptim for payment.

74.     Aptim requested and Patriot provide a labor hour fee structure to incorporate into the contract as "Exhibit F".

75.     Exhibit "F" was separately cited in the first page of the contract, stating, "Patriot's project management office labor costs billed separately based upon agreed upon positions and rates (subject to receipt of your rate sheet)"

76.     On September 26, 2018, Jonathan Hunt included in a Change Order 5 to the Subcontract, language which unilaterally eliminated "Exhibit 7" in its entirety.

77.     In order to entice Patriot to execute Change Order 5, Defendant Jonathan Hunt assured Patriot that it would not impact their contract. Specifically, Defendant Hunt stated at the time the

-10-

contract was originally executed, that the inclusion of Exhibit 7 was an oversight and that it was "not relevant" (meaning it would not impact) the current contract and that Patriot should ignore it.

78.     More specifically, Defendant Jonathan Hunt stated that the Change Order had, as its sole purpose, to extend the performance period and all other terms and conditions of the subcontract would remain unchanged.

79.     In order to coerce Patriot into executing Change Order 5, Aptim ceased making payments until Patriot executed the change order.

80.     Within days of executing Change Order 5, Plaintiff was informed , by David Orphey, their labor hour costs would now be denied.

81.     On January 9, 2019, there was a conference call between Aptim representatives and Patriot representatives regarding Change Order 5.

82.     The Aptim representatives on the call were Jonathan Hunt, Jim Pointer (VP of Global Supply Chain) and David Orphey (Director of Project Controls).

83.     The Patriot representatives on the call were the Executive Vice President of Patriot, James Foster and President, Michael Olvey

84.     On the January 9 call, Plaintiff agreed to negate any premium overtime from its labor hour rates and that such "overtime" was not contemplated by the contract.

85.     David Orphey, Director of Project Controls, employee of Defendant, stated that Plaintiff was unique in that it was billing for both construction services under the fixed price unit pricing schedule, and also for supplemental support labor costs under the cost reimbursable portion of the contract.

86.    David Orphey averred that the rates in Attachment "F" to the contract did not apply to Patriot.

87.    David Orphey stated that the issues with paying the pass-through overhead costs were not Aptim's idea but Witt O'Brien's.

88.    In a letter from Aptim to Patriot on April 30, 2019, Aptim suggested that the deletion of Change Order 5, eliminated Patriots pass through (labor) cost reimbursable portion of the contract.

## Specific Facts Evidencing "Cram-Down" Tactics

89.    Patriot subsequently submitted sixty-one (61) additional invoices totaling millions of dollars.

90.    Aptim gave no response as to the approval or disapproval other than to pay 80% of the first 15 construction invoices and 15 of the labor invoices.  The remaining 7 construction invoices have not been commented on or paid. The labor invoices have been rejected according to the letter.

91.    To date, Aptim has not paid 58 of the submitted invoices.

92.    Defendant Jonathon Hunt was involved in the deception, is personally responsible for approving invoices submitted by Patriot and is acting thus outside the scope of his employment.

93.    Aptim, Defendant Hunt and Defendant Camarano have withheld payment in order to coerce Patriot into agreeing to the 50-75-100 payment structure, which would substantially reduce the Subcontract price.

94.    Patriot was deceived into signing Change Order 5 on January 5, 2019 provided by Jonathan Hunt, when Hunt assured them that Exhibit 7 was inconsequential to their Subcontract and nothing would change.

-12-

95.    Shortly after executing Change Order 5, the same day, David Orphrey with Aptim, stated "Change Order # 5 removes Exhibit 7 effective 12/01/2018. Because pass-through costs are no longer eligible costs …. Labor invoices are rejected."

Patriot disagreed with this interpretation.

96.    On January 9, 2019, Patriot had a conference call with David Orphrey of Aptim.

97.    During the call above, prior to initiating the discussion, **David Orphrey** began by stating, he apologized for the confusion centered around the removal of Exhibit 7 and **confirmed the labor hour invoices would indeed be approved for payment.**

98.    The same page of the Subcontract notes payment of 80% of submitted invoices regardless of whether the client pays or not – not "paid when paid".

99.    On March 27, 2019, Defendant Jonathon Hunt sent an email titled "VIHFA STEP Program unit price list change letter-Patriot Response Group" and asked that Patriot "review and sign the attached price list change letter and send back to me immediately."

100.    The March 27, 2019 price list change letter included a new price list for roof rebuilding.

101.    The price change letter to Patriot was the first indication that Patriot received concerning any intent by Aptim to change the pricing structure.

102.    The March 27, 2019 letter included a revised price list that proposed the 50-75-100 pricing structure and that proposed to substantially reduce the amount to be paid by Aptim to Patriot for rebuilding roofs.

103.    The March 27, 2019 letter specified that the revised price list would be retroactive and would therefore apply to all of Patriot's invoices—and all of Patriot's completed work.

104.    At the time the March 27, 2019 letter was sent to Patriot, Patriot's work was substantially complete.

105.    As a consequence of Aptim's late notice, Patriot was obligated to pay for materials and subcontractors based on the fixed-priced amounts set forth in the original price list.

106.    Aptim's conduct was specifically calculated to mislead Patriot.

107.    Aptim's actions were a bait and switch: Aptim wrongfully led Patriot to believe that Patriot would be paid the agreed-upon, fixed per-square-foot price, and once the work was completed, told Patriot that the prices would be substantially reduced and then withheld payment to coerce Patriot.

108.    Jonathon Hunt is personally liable for his contribution to this bait and switch, because he knowingly conspired in efforts to coerce Patriot into agreeing to the revised price list and other onerous terms by, among other actions, withholding payments from Patriot.

109.    Jonathon Hunt, as the Subcontract Administrator, knowingly succumbed to the pressure from Aptim, as a result of media reports, concerning Aptim's unsatisfactory performance with hurricane-recovery efforts in the Virgin Islands.

110.    Jonathon Hunt personally embarked on an intentional scheme to mislead Patriot into remaining on the Virgin Islands.

111.    Jonathon Hunt understood that, if Patriot were to leave the Virgin Islands in response to the oppressive 50-75-100 pricing structure, that he and Aptim ultimately attempted to force onto Patriot, Aptim would be faced with additional delays, financial losses, and negative scrutiny related to its performance on the hurricane-recovery efforts, which would adversely impact Defendant Hunt's employment status.

-14-

112.    Jonathon Hunt is personally liable for his misrepresentations and suppressions related to the 50-75-100 pricing structure and his individual effort to cajole Patriot into performing the work while intending to pay Patriot cents on the dollar.

113.    Aptim and Jonathon Hunt misled Patriot, by withholding information.

114.    Aptim and Jonathon Hunt withheld payment to Patriot in order to entice them into finishing roofing work on the Virgin Islands before changing the entire pricing structure.

115.    Aptim and Jonathon Hunt attempted to coerce Patriot into agreeing to onerous payment terms, including but not limited to the March 27, 2019 price list.

116.    On April 30, 2019, Aptim (through Robert Papizan, Global Supply Chain Manager) sent a letter to Patriot Management, stating that Aptim was in effect disavowing any payments it had made pursuant to the Labor Hour Agreement and that again, since Aptim had removed Exhibit 7, through Change Order 5, the labor charges were no longer valid and that Aptim would have its payments offset by $1,101,479.06.

117.    Aptim and Jonathon Hunt took actions knowing that the pricing would ultimately be reduced.

118.    Aptim and Jonathon Hunt continue to withhold payment from Patriot in an ongoing attempt to force Patriot to agree to onerous payment terms, including but not limited to the 50-75-100 price structure and the March 27, 2019 price list.

119.    On March 18, 2019, Aptim sent an email proposing the use of drone photographs—instead of hand measurements collected on site—for remeasuring the square footage for which Patriot would be compensated on completed repairs, which would reduce the overall reimbursable square

footage, because an aerial photograph can only measure in two dimensions and cannot take into account the slope or pitch of the roof's 3-dimensional structure

120.    Defendant Aptim and Jonathon Hunt's conduct is the type of egregious action involving elements of fraud, misrepresentation, deception, and other unethical conduct proscribed by the Louisiana Unfair Trade Practices Act ("LUTPA"). Patriot is entitled to recover under LUTPA as a result, including treble damages and attorneys' fees.

121.    In accordance with Louisiana Revised Statutes § 51:1409(A), a copy of this Petition is being sent to the Attorney General.

## CLAIM 1:
## APTIM HAS VIOLATED THE FEDERAL ACQUISITION REGULATION

122.    The Federal Acquisition Regulation 52.232-27 requires Prompt Payment to Subcontractors of Federal Contractors.

123.    The Prompt Payment Act to Subcontractors requires subcontractors be paid within seven (7) days of the prime (Aptim) receiving payment from the government

124.    Aptim has received funds from the Government on which Prompt Payment to Patriot was required.

## CLAIM TWO:
## APTIM HAS BREACHED THE SUBCONTRACT

125.    Petitioners adopt and incorporate all prior paragraphs as though set forth in full herein.

126.    Aptim and Patriot are parties to a Subcontract dated September 26, 2018.

127.    The Subcontract incorporated, among other documents, a document referred to as "Roof Bid Tab USVI Aptim-Patriot" that set forth Patriot and Aptim's agreed-upon, fixed pricing for performing roofing work in the Virgin Islands.

128. The Subcontract further specifies a soft-cost payment of $10,000.00 per home for work performed under the STEP program and a soft-cost payment of $18,000.00 per home for other roofing work.

129. The Subcontract provided: 80% of the invoiced amount due and payable within 15 calendar days after invoice submittal. The remaining 20% balance to be paid within 10 calendar days of receipt of Aptim's payment from client (20% only is paid when paid).

130. The Subcontract further incorporated a document titled "Aptim Environmental Infrastructure, Inc. Work Agreement" (the "Work Agreement").

131. The Work Agreement includes, among other provisions, that (1) "Purchase Orders shall be issued pursuant to th[e] [Work] Agreement," and (2) the Prevailing Party in litigation under the Work Agreement would be entitled to a contractually defined attorneys' fee.

132. The Work Agreement further provided that Patriot would not be required to provide any materials for the work.

133. The Subcontract also incorporated a document referred to as "Contract Flow Downs (including Exhibit 7 & 11)."

134. These flow downs are found in the Federal Acquisition Regulation and are affected by Federal Case Law interpretation.

135. The referenced "Exhibit 7" set forth Patriot and Aptim's agreement with respect to whether certain pass-through costs would be paid "at cost" or "with mark up."

136. Notwithstanding the agreement in the Subcontract and its incorporated documents that Purchase Orders for work would be issued to Patriot, Aptim issued a Notice to Proceed in the

contract as a no later than term, but Aptim did not provide virtually any work orders to Patriot for over one month after the contractually agreed to Notice to Proceed date.

137.    Aptim failed to provide timely and accurate estimating criteria, delaying Patriot's ability to prepare estimates.

138.    Aptim is liable for the delay damages caused by instructing and/or otherwise leading Patriot to be fully mobilized, on-site and ready to work on September 28, 2018, and subsequently failing to issue work orders as agreed.

139.    By Other Direct Costs invoice dated October 17, 2018, Patriot submitted complete documentation to Aptim demonstrating its delay damages. Aptim has nonetheless failed to pay Patriot for the damages caused by Aptim's delay. Aptim is also liable for not paying Patriot's invoices timely, pursuant to the Subcontract and the Prompt Payment Act.

140.    Notwithstanding the terms of the Subcontract and its incorporated documents, including the terms of the Work Agreement, Patriot has submitted certain valid invoices to Aptim, but has not been paid

141.    By failing to provide accurate and timely estimating criteria, failing to pay invoices on time, failing to pay invoices at all, and failing to pay Patriot's pass-through labor costs, Aptim has breached the Subcontract, including the documents incorporated into and referenced in the Subcontract, and is liable for all resulting damages, interest, costs, and attorneys' fees.

**CLAIM THREE:**
**VIOLATION OF LUTPA BY APTIM**

142.    Petitioners adopt and incorporate all prior paragraphs as though set forth in full herein.

-18-

143. The Louisiana Unfair Trade Practices Act ("LUTPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *See* LA. REV. STAT. § 51:1405(A).

144. Patriot's claim under LUTPA against Aptim is an extra-contractual claim.

145. Defendant Aptim's conduct in inducing Patriot to travel to and remain in the Virgin Islands and to complete the roofing work while actively suppressing its intent to alter the pricing terms at the end of the relationship constitutes an unfair or deceptive act or practice in the conduct of any trade or commerce.

146. As a result of Defendant Aptim's unfair trade practices, Patriot is entitled to an award of treble damages and attorneys' fees, plus costs and interest.

**CLAIM FOUR:**
**VIOLATION OF LUTPA BY JONATHON HUNT**

147. Petitioners adopt and incorporate all prior paragraphs as though set forth in full herein.

148. Defendant Jonathon Hunt's conduct in withholding payment on Patriot's properly submitted and supported invoices for the purpose of coercing Patriot into agreeing to onerous payment terms constitutes an unfair or deceptive act or practice in the conduct of any trade or commerce.

149. Patriot's claim under LUTPA against Defendant Hunt is an extra-contractual claim.

150. As a result of Defendant Jonathon Hunt's unfair trade practices, Patriot is entitled to an award of treble damages and attorneys' fees, plus costs and interest.

**CLAIM FIVE:**
**CONSPIRACY TO VIOLATE LUPTA BY APTIM, LISSA MONTOYER AND**
**DOMINGO CAMARANO**

151.    Petitioners adopt and incorporate all prior paragraphs as though set forth in full herein.

152.    Defendant Domingo Camarano's (Vice President) conduct in negotiating the Subcontract with Patriot properly regarding submitted and supported invoices for the purpose of coercing Patriot into agreeing to onerous payment terms constitutes an unfair or deceptive act or practice in the conduct of any trade or commerce.

153.    Patriot's claim under LUTPA against Defendant Camarano is an extra-contractual claim.

154.    As a result of Defendant Domingo Camarano's unfair trade practices, Patriot is entitled to an award of treble damages and attorneys' fees, plus costs and interest.

## CLAIM SIX:
## CONSPIRACY TO VIOLATE LUPTA BY APTIM AND LISSA METOYER

155.    Petitioners adopt and incorporate all prior paragraphs as though set forth in full herein.

156.    Defendant Lissa Metoyer's conduct in managing the Subcontract with Patriot properly regarding submitted and supported invoices for the purpose of coercing Patriot into agreeing to onerous payment terms constitutes an unfair or deceptive act or practice in the conduct of any trade or commerce.

157.    In addition, Lissa Metoyer pressured Patriot to continue performance despite knowing they were not being fully compensated for their work.

158.    Patriot's claim under LUTPA against Defendant Metoyer is an extra-contractual claim.

159.    As a result of Defendant Lissa Metoyer's unfair trade practices, Patriot is entitled to an award of treble damages and attorneys' fees, plus costs and interest.

## CLAIM SEVEN:
## CONSPIRACY TO VIOLATE LUTPA BY APTIM, JONATHON HUNT, DOMINGO CAMARANO AND LISSA METOYER

160.    Petitioners adopt and incorporate all prior paragraphs as though set forth in full herein.

161.    Pursuant to Louisiana Civil Code article 2324(A), "[h]e who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act."

162.    Defendants Aptim, Jonathon Hunt, Domingo Camarano and Lissa Metoyer  negotiated, entered into and/or managed an agreement to violate LUTPA by suppressing information concerning Aptim's intent to alter the pricing after Patriot entered the Subcontract and had completed all of the roofing work, withholding payment from Patriot while attempting to coerce Patriot into agreeing to onerous payment terms and placing ever-increasing obstacles—such as the March 18, 2019 notification concerning drone photographs and the April 25, 2019 letter concerning photographic evidence—to Patriot's ability to complete and be paid for its work.

163.    Defendants Aptim, Jonathon Hunt, Domingo Camarano and Lissa Metoyer committed a violation of LUTPA by, among other actions, suppressing information concerning Aptim's intent to alter the pricing after Patriot entered the Subcontract and had completed the roofing work, withholding payment from Patriot while attempting to coerce Patriot into agreeing to onerous payment terms, and placing ever-increasing obstacles—such as the March 18, 2019 notification concerning drone photographs and the April 25, 2019 letter concerning photographic evidence— to Patriot's ability to complete and be paid for its work.

164.    Defendants Aptim, Jonathon Hunt, Domingo Camarano and Lissa Metoyer agreed on the intended outcome or result. Specifically, Aptim, Jonathon Hunt, Domingo Camarano and Lissa Metoyer agreed to attempt to coerce Patriot into accepting a lowered pricing schedule and to

mislead Patriot into staying in the Virgin Islands for the purpose of performing the work needed by Aptim.

165.    Patriot's claim for Conspiracy to Violate LUTPA is an extra-contractual claim.

166.    Defendants Aptim, Jonathon Hunt, Domingo Camarano and Lissa Metoyer are liable, in solido, for all resulting damages from their conspiracy to violate LUTPA, including but not limited to treble damages, attorneys' fees, costs, and interest.

## CLAIM EIGHT:
## FRAUD BY APTIM

167.    Petitioners adopt and incorporate all prior paragraphs as though set forth in full herein.

168.    Defendant Aptim is liable for fraud through both suppression and misrepresentation.

169.    Upon information and belief, Defendant Aptim knew before Patriot completed its work that Aptim would dictate that the pricing be lowered for the roofing work completed by Patriot and withhold payment unless Patriot agreed to the cram-down.

170.    Aptim owed a duty to Patriot to disclose Aptim's knowledge that payment would be withheld unless Patriot agreed to a pricing change and that the pricing would be changed because, among other reasons, Aptim knew or should have known that the substantial decrease in pricing would seriously affect and undermine Patriot's contractual expectations and ability to perform, including but not limited to Patriot's ability to pay its subcontractors.

171.    As with its earlier suppressions, Aptim owed a duty to disclose the agreement and/or understanding it had previously concluded with others to lower the pricing to be paid to Patriot for the roofing work to be completed by Patriot, because, among other reasons, Aptim knew or should have known that the substantial decrease in pricing would seriously affect and undermine Patriot's

contractual expectations and ability to perform, including but not limited to Patriot's ability to pay its subcontractors.

172.    Upon information and belief, Aptim intended to deceive Patriot for, among other reasons, the purpose of tricking Patriot into remaining in the Virgin Islands and completing the roofing work for Aptim.

173.    Patriot justifiably relied on Aptim's misrepresentations and suppressions in performing the roofing work for Aptim, particularly because, among other reasons, Aptim approved Patriot's invoices for payment and submitted monthly certifications to Patriot's lender that Patriot was "fulfill[ing] [its] commitment" with respect to "work[] on the island of St. Thomas and St. John for Aptim."

174.    Patriot was damaged by Aptim's misrepresentations and suppressions both because (1) Patriot completed all the work assigned to it and was subsequently informed by Aptim that Patriot would not be compensated pursuant to the previously agreed pricing terms and (2) Patriot paid or agreed to pay its subcontractors at a rate that corresponded to and accorded with the previously agreed-upon pricing terms.

175.    Patriot's claim for fraud against Aptim is an extra-contractual claim.

176.    This not only violates Louisiana law, but because of the FAR flown down, the duty of good faith and fair dealing under Federal law.

177.    As a result of Aptim's fraud, Patriot is entitled to an award of damages, costs, interest, and attorneys' fees.

## CLAIM NINE:
## SUPPRESSION BY DEFENDANT JONATHON HUNT

-23-

178.    Petitioners adopt and incorporate all prior paragraphs as though set forth in full herein.

179.    Defendant Jonathon Hunt was the Subcontract Administrator for the Subcontract.

180.    Defendant Jonathon Hunt deliberately suppressed Aptim's intent to reduce the pricing to be paid to Patriot for roofing work.

181.    Defendant Jonathon Hunt owed a duty to disclose Aptim's agreement and/or understanding with others to reduce Patriot's pricing because, among other reasons, Defendant Jonathon Hunt knew or should have known that the substantial decrease in pricing would seriously affect and undermine Patriot's contractual expectations and ability to perform, including but not limited to its ability to perform in paying its subcontractors.

182.    The suppression by Defendant Jonathon Hunt of Aptim's true intent was material because, among other reasons, had Patriot known of Aptim's agreement and/or intent to reduce Patriot's pricing, Patriot would not have continued working on the project.

183.    Upon information and belief, Jonathon Hunt intended to deceive Patriot for, among other reasons, the purpose of advancing his employment interests, protecting his personal reputation, tricking Patriot into remaining in the Virgin Islands, and cajoling Patriot into completing the roofing work for Aptim.

184.    Patriot justifiably relied on Defendant Jonathon Hunt's suppressions in performing the roofing work for Aptim, particularly because, among other things, Patriot was consistently informed that its invoices had been approved for payment.

185.    Patriot was damaged by Defendant Jonathon Hunt's suppression both because (1) Patriot completed all of the work assigned to it and was subsequently informed by Aptim that Patriot would not be compensated pursuant to the previously agreed pricing terms and (2) Patriot paid or

agreed to pay its subcontractors at a rate that corresponded to and accorded with the previously agreed-upon pricing terms.

186.    Patriot's claim against Defendant Jonathon Hunt for suppression is an extra-contractual claim.

187.    Jonathon Hunt's conduct violates not only Louisiana law, but because of the FAR flown down, the duty of good faith and fair dealing under Federal law.

188.    As a result of Defendant Jonathon Hunt's fraud, Patriot is entitled to an award of damages, costs, interest, and attorneys' fees.

## CLAIM TEN:
## CONSPIRACY TO COMMIT FRAUD BY APTIM AND JONATHON HUNT

189.    Petitioners adopt and incorporate all prior paragraphs as though set forth in full herein.

190.    Defendants Aptim and Jonathon Hunt entered an agreement to defraud Patriot by suppressing and/or misrepresenting information concerning Aptim's intent to alter the pricing structure after Patriot had completed the roofing work.

191.    Defendants Aptim and Jonathon Hunt actually defrauded Patriot by, among other actions, suppressing and/or misrepresenting information concerning Aptim's intent to alter the pricing structure after Patriot had completed the roofing work.

192.    Defendant Aptim and Jonathon Hunt agreed on the intended outcome or result of their conspiracy. Specifically, Aptim and Jonathon Hunt agreed to coerce Patriot into accepting a lowered pricing schedule and to mislead Patriot into staying in the Virgin Islands for the purpose of performing the work needed by Aptim and Defendant Hunt.

193.    Patriot's claim for Conspiracy to Commit Fraud is an extra-contractual claim.

194.   Defendants Aptim and Jonathon Hunt are therefore liable, in solido, for all resulting damages from their conspiracy to defraud Patriot, including but not limited to damages, attorneys' fees, costs, and interest.

## CLAIM ELEVEN:
## NEGLIGENCE AGAINST JONATHON HUNT

195.   Petitioners adopt and incorporate all prior paragraphs as though set forth in full herein.

196.   Defendant Jonathon Hunt is the Subcontract Administrator for the Subcontract between Aptim and Patriot.

197.   Aptim delegated the responsibility of approving Patriot's invoices to Defendant Jonathon Hunt.

198.   Defendant Jonathon Hunt owed and continues to owe a duty to Patriot to perform his job responsibilities in a reasonable manner.

199.   Jonathon Hunt's conduct violates not only Louisiana law, but because of the FAR flown down, the duty of good faith and fair dealing under Federal law.

200.   Defendant Jonathon Hunt has breached his duty to Patriot to perform his job responsibilities in a reasonable manner by, among other actions, refusing and/or failing to authorize timely payments to Patriot.

201.   The breach by Defendant Jonathon Hunt of the duty owed to Patriot has resulted in damages to Patriot, including but not limited to damages caused by Patriot's subsequent inability to pay its subcontractors.

202.   The claim for negligence against Defendant Jonathon Hunt is an extra-contractual claim.

203.    Patriot is entitled to an award of damages, costs, and interest as a result of Defendant Jonathon Hunt's negligence.

## CLAIM TWELVE:
## BREACH OF WRITTEN CONTRACT BY APTIM

204.    Petitioners adopt and incorporate all prior paragraphs as though set forth in full herein.

205.    Pursuant to the Subcontract, including its incorporated documents, Aptim agreed to (1) provide work orders to Patriot; (2) provide all materials for Patriot to perform its roofing work; (3) timely pay Patriot's invoices within fifteen (15) days; and (4) pay Patriot's pass-through costs; and (5) abide by the FAR flow downs they inserted.

206.    From October 2, 2018 through November 19, 2018, Patriot suffered delay damages as a result of Aptim's failure to issue work orders and accurate estimate criteria as agreed

207.    Despite receiving properly submitted and supported invoices, Aptim has with respect to certain invoices either failed to pay within fifteen (15) days or has failed to pay altogether.

208.    Despite receiving properly submitted and supported invoices, Aptim has failed to pay Patriot's pass-through costs.

209.    As a result of Aptim's failures to perform, Aptim is in breach of the Subcontract, including the documents incorporated into the Subcontract.

210.    Patriot has performed all its obligations under the Subcontract. As a result, Petitioners are entitled to payment for the invoices, amounts associated with the screws purchased by Patriot, delay damages, and pass-through costs described above.

211.    Petitioners are entitled to an award of damages, costs, interest, and attorneys' fees as a result of Aptim's failure to perform under the Subcontract, including the documents incorporated into the Subcontract.

## CLAIM THIRTEEN:
## DETRIMENTAL RELIANCE AGAINST APTIM

212.    Petitioners adopt and incorporate all prior paragraphs as though set forth in full herein.

213.    In continuing to perform on the contract, Patriot relied to its detriment on the representations of Aptim, Jonathan Hunt and other employees of Aptim.

214.    Because of its reliance on representations of Aptim leadership, Patriot remains unpaid monies due under both the construction portion of the contract as well as the Labor Hour portion of the contract.

## CLAIM FOURTEEN:
## UNJUST ENRICHMENT AGAINST APTIM

215.    Petitioners adopt and incorporate all prior paragraphs as though set forth in full herein.

216.    In the alternative to the claims for breach of an oral contract and detrimental reliance, Patriot is entitled to recover for Aptim's unjust enrichment.

217.    Aptim is attempting to be unjustly enriched by modifying the contract terms after performance of the contract.

218.    In the alternative to the claims for breach of contract and detrimental reliance, Patriot is entitled to recover an award of damages, costs, and interest as a result of Aptim's unjust enrichment.

## JURY DEMAND

Petitioner demands a trial by jury on all issues triable as such.

-28-

## **PRAYER FOR RELIEF**

**WHEREFORE,** Petitioners ask that this Court deem this Petition for Damages good and sufficient and that, after due proceedings are had, this Court enter a Judgment in favor of Petitioners awarding:

1) all damages to which Petitioners are entitled, including but not limited to treble damages under the Louisiana Unfair Trade Practices Act;

2) All Prompt Payment Act Interest and Penalties due Patriot under the Prompt Payment Act to Subcontractors of the Federal Acquisition Regulation

3) pre-judgment and post-judgment interest;

4) Breach of Contract Damages, including loss of productivity, interest and penalties for non-payment of its subcontractors due to lack of prompt payment to Patriot;

5) Payment of 80% of its invoices in compliance with the terms and conditions of the contract;

6) attorneys' fees as herein described and costs; and

7) any other relief to which Petitioners are legally entitled.

Respectfully submitted,

David A. Rose
ROSE CONSULTING LAW FIRM
P.O. Box 2186
2409 Bemiss Road
Valdosta, Georgia 31604
Telephone: (678) 854-0222

-29-